# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No. 1:14-cv-00087 CMA-KMT**

UNITED STATES OF AMERICA, for the use and benefit of HUDSPETH &
ASSOCIATES, INC., a Colorado corporation,

      Plaintiffs,

vs.

CENTERRE CONSTRUCTION, a Colorado Corporation
MATSUO ENGINEERING, LLC, a Colorado Limited Liability Company
MATSUO ENGINEERING CENTERRE CONSTRUCTION, a Joint Venture
MATSUO-CENTERRE A JOINT VENTURE, LLC, a Colorado Limited Liability Company
BERKLEY REGIONAL INSURANCE COMPANY, a Delaware corporation,
MATSUO ENGINEERING CENTERRE CONSTRUCTION A JOINT VENTURE, LLC a
Colorado Limited Liability Company

      Defendants and Third Party Plaintiffs.

vs.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a Maryland Company

      Third-Party Defendant.

---

**DEFENDANTS' FIRST SET OF INTERROGATORIES DIRECTED TO THE PLAINTIFF**

---

      Defendants, by and through their undersigned counsel, hereby request, pursuant

to Rules 26 and 33 of the Federal Rules of Civil Procedure, that the Plaintiff, Hudspeth

& Associates, Inc. ("Hudspeth"), within thirty (30) days, serve written answers and

responses to the following interrogatories ("Interrogatories").

      These Interrogatories shall be deemed continuing so as to require supplemental

responses if the Plaintiff obtains additional information after service of its original

responses.    Responses to these Interrogatories shall conform to the following

Definitions and Instructions.

## **DEFINITIONS AND INSTRUCTIONS**

1.      Plaintiff shall respond to the Interrogatories not later than thirty (30) days after receipt of same.

2.      If Plaintiff encounters any ambiguity in construing either an Interrogatory, or a definition or instruction relevant to the Interrogatories, set forth the matter deemed "ambiguous" and set forth the construction chosen, or used, in responding.

3.      If any Interrogatory is objected to, in whole or in part, the grounds for objecting must be stated with specificity.  Plaintiff shall respond fully to that portion or portions of the Interrogatory to which no objection is asserted.

4.      Plaintiff shall supplement its answers to the Interrogatories as required by the Federal Rules of Civil Procedure.

5.      "Document" is used in the broadest sense of the word and means all written, printed, typed, recorded, electronic, or graphic matter, including originals, copies, and drafts, however produced or reproduced, of every kind, nature, and description, including, but not limited to, correspondence, telegrams, faxed communications, notes and any other written and/or electronically transmitted communications; notes of oral communications, telephone conversations, meetings or other notes recording any information, discussion, directives, questions or conversations; calendars, appointment books, logs, diaries, notebooks or similar materials; investigative files and related materials; contracts or agreements; memoranda; reports; studies; recordings, films, photographs, video materials, charts or other visual materials; computer print-outs or media; tapes or cassettes; analyses; projections; work papers; orders, work orders, change orders, extra work orders,

additional work orders and force account orders and related documents; invoices, telephone messages; e-mail; computer disks; computer assisted drawing files; digital files; digital voice mail messages; compilations of data or information; plans, drawings and specifications; test results; or other materials from which data or information can be obtained.

6.     "Communication(s)" shall mean, without limitation of its generality, letters, notes, electronic mail, memoranda, telefaxes, statements, discussions, meetings, face to face conversations, telephone conversations, speeches, remarks, questions, answers, panel discussions, symposiums, or any other kind of transmittal of information, whether written or oral.

7.     "Correspondence" shall mean emails, letters, telegrams, telexes, cables, memoranda, or other writings mailed, delivered, emailed or otherwise transmitted to any person.

8.     "Statement" shall mean any oral communication, whether or not made in the presence of another person, in a telephone conversation, or in any other context, and regardless of whether it has been reduced to writing or otherwise recorded or referred to in any document.

9.     "Relating to" (or any of its forms) shall mean relating to, reflecting, evidencing, referring to, pertaining to, consisting of, reflecting, evidencing, concerning, constituting, representing, comprising, supporting, contradicting, referring to, relevant to, containing information about, stating, identifying, describing, dealing with, analyzing, commenting on, responding to, noting, embodying, containing, mentioning, studying,

3

recording, discussing, or evaluating or in any way logically or factually connected with the matter discussed.

10.    "Person" or "entity" includes, but is not limited to, an individual, a limited partnership, a corporation or other business association, or government agency or entity, or any other entity.  All references to "person" in the singular number include the plural number and vice-versa.

11.    The words "you," "Plaintiff" or "Hudspeth" shall mean Hudspeth & Associates, Inc., its predecessors and successors in interest, all former and present subsidiaries, divisions, parent corporations or other related corporate entities, its principals, directors, officers, employees, agents, assigns, or any other related person or entity acting in its direction, including but not limited to any and all present and former attorneys, accountants, agents, representatives, employees and other persons acting or purporting to act for or on the Plaintiff's behalf.

12.    "MC Defendants" shall mean Centerre Construction; Matsuo Engineering, LLC; Matsuo Engineering/Centerre Construction, a Joint Venture; Matsuo-Centerre A Joint Venture, LLC; and Matsuo Engineering Centerre Construction A Joint Venture, LLC individually or collectively, and all present and former attorneys, accountants, agents, representatives, employees or other persons acting or purporting to act on Defendants' behalf.

13.    "Berkley" shall mean defendant Berkley Regional Insurance Company.

14.    "GSA" shall mean the Government Services Administration, and all present and former attorneys, accountants, agents, representatives, employees or other persons acting or purporting to act on its behalf.

4

15.     "Identify" or "identity," when used with respect to an individual, includes providing the following information:

a.     state the individual's full name;

b.     individual's present or last known home and business addresses;

c.     the individual's home and business telephone numbers;

d.     the identity of the individual's employer or employers at the time of the matter inquired into and the individual's position at that time;

e.     the identity of the present employer of the individual and the position now held by the individual.

16.     "Identify" or "identity," when referring to an entity such as a corporation, partnership, firm or other organization, includes providing the following information:

a.     the full name of the entity;

b.     the entity's present or last known address;

c.     the full name and business address of the entity at the time the matter is required into;

d.     the type of business conducted by the entity.

17.     "Identify" or "identity," when used with respect to a document, includes providing the following information:

a.     a description of the type of document;

b.     date or dates appearing on the face of the document or, if no date appears, the date upon which the document was prepared;

c.     the identity of its originator, including all persons who authored, wrote, signed, initiated, dictated, reviewed, approved or otherwise participated in creating the document;

d.     the identity of the addressee(s) and of each other recipient;

e.    the title and the general subject matter of the document and the number of pages of the document;

f.    any numerical or alphabetical designation applied to the document;

g.    the designation and location of the file(s) where the original and each copy are normally presently being kept and the identity of each custodian thereof;

h.    if the document no longer exists, a statement describing the disposition that was made of it and the identity of the person who disposed of it.

18.    "And" as well as "or" shall be construed either disjunctively or conjunctively, as necessary to bring within the scope of the Request all responses which might otherwise be construed to be outside of the scope.

19.    "Each" shall be construed to include the word "every," and "every" shall be construed to include the word "each."

20.    "Any" shall be construed to include the word "all," and "all" shall be construed to include the word "any."

21.    References to the singular shall include the plural, and references to the plural shall include the singular.

22.    The use of a verb in any tense shall be construed as the use of the verb in the past or present tense, whenever necessary to bring within the scope of the Request all responses which might otherwise be construed to be outside its scope.

23.    As used herein, "the Complaint" refers to Plaintiff's April 9, 2014 amended complaint (D.I. #25) in the above-captioned matter.

24.    As used herein, "the Answer" refers to Defendants' April 25, 2014 answer (D.I. #31) in the above-captioned matter.

25.     As used herein, "the Counterclaim" refers to Defendants' April 25, 2014 counterclaim, as set forth in the Answer (D.I. #31) in the above-captioned matter.

26.     As used herein, "Answer to the Counterclaim" refers to Plaintiff's May 30, 2014 answer to the Counterclaim (D.I. #40) in the above-captioned matter.

27.     As used herein, "Third-Party Complaint" refers to Plaintiff's May 9, 2014 third-party complaint against Fidelity (D.I. #36) in the above-captioned matter.

28.     As used herein, "Answer to the Third-Party Complaint" refers to Fidelity's July 25, 2014 answer to the Third-Party Complaint (D.I. #43) in the above-captioned matter.

29.     As used herein, "the Project" refers to the construction project commonly known as the modernization of the New Custom House in Denver, Colorado.

30.     As used herein, "the Prime Contract" refers to Contract No. GS-08P-10-JB-C-0007, entered into on or about March 17, 2010 between the MC Defendants and the United States of America, through the U.S. General Services Administration.

31.     As used herein, "Bid Pack #2" refers to the Abatement Bid Pack #2, which MC Defendants provided to Plaintiff during the solicitation of the Subcontract.

32.     As used herein, "the Subcontract" refers to the contract for asbestos abatement, demolition, and other related work on the Project, Contract No. 51002-13-2050, entered into on or about August 24, 2011 between the MC Defendants and Hudspeth.

33.     As used herein, "Fidelity" refers to Third-Party Defendant Fidelity and Deposit Company of Maryland.

34.     As used herein, "Hudspeth's Performance Bond" refers to the Subcontract Performance Bond, identified as Bond No. PRF7625120-00, executed on or about August 29, 2011, with Hudspeth, as principal, and Fidelity, as surety, for the benefit of MC Defendants.

35.     As used herein, "Walsh" refers to Walsh Environmental Scientists and Engineers.

36.     As used herein, "the Walsh Report" refers to the June 17, 2011 report issued by Walsh Environmental Scientists and Engineers, as referenced in paragraph 26 of the Complaint.

## INTERROGATORIES

1.     Identify every member of the "executive team" that Hudspeth established to evaluate the "request for reconciliation of credits and debits on the [P]roject," as identified in Hudspeth's July 10, 2013 letter, signed by Robert Levitt, and define each identified individual's responsibilities as a member of the "executive team."

   **ANSWER**:

2.     Identify every individual that Hudspeth used to estimate and/or prepare its bid/proposal response to Bid Pack #2, and define the responsibility(ies) of each such individual as related to that bid/response.

   **ANSWER**:

3.     Identify each document that you believe constituted a part of, or was incorporated into, the Subcontract, and explain the reasons for such belief.

   **ANSWER**:

4.     Explain Hudspeth's interpretation of the scope of the original Subcontract, in particular, the locations and amounts of asbestos-containing material that were to be removed.

**ANSWER**:

5.     Identify every individual that Hudspeth used to assess and confirm pricing, schedule and subcontract scope of work as required under the Subcontract [Bates Stamped H&A-005680] between July 6, 2011 and up to and including August 29, 2011, and define the responsibility(ies) of each such individual as related to this effort.

**ANSWER**:

6.     If you contend that there were differences in the scope of work outlined in Bid Pack #2 or Hudspeth's response thereto, as compared to the scope of work required by the original Subcontract (prior to any amendments or modifications), state all facts and identify all documents supporting such contention.  Include in your answer a detailed description of each such alleged difference.

**ANSWER**:

7.     State all facts and identify all documents that support the statement, made in paragraph 26 of the Complaint, that the Walsh Report significantly understated the asbestos to be abated throughout the Project.

**ANSWER**:

8.     Identify every individual involved in the analysis of the Walsh Report, demolition drawings, and/or the Walsh Abatement Master Specifications.

**ANSWER**:

9.     State all facts and identify all documents that support the statement, made in paragraph 27 of the Complaint, that Walsh was acting as an authorized representative of the MC Defendants with regard to the demolition and removal of asbestos-containing material from the Project.

       **ANSWER**:

10.    State all facts and identify all documents that support the statement, made in paragraph 28 of the Complaint, that Hudspeth was directed by Defendants to perform substantially more asbestos abatement work and in different locations than originally anticipated.

       **ANSWER**:

11.    Specifically identify every purported difference between the scope of work set forth in the original Subcontract, and the scope of work Hudspeth allegedly was ultimately required to perform by MC Defendants.  Include in your answer a detailed description of the locations and amounts of asbestos-containing materials.

       **ANSWER**:

12.     For any alleged difference identified in your answer to Interrogatory No. 11, above, state whether or not the difference was the subject of a change order request, modification and/or amendment and, if so, identify the specific change order request(s), modification(s) and/or amendment(s).

       **ANSWER**:

13.    Identify every individual involved in the preparation of the change orders and/or requests/applications for payment concerning the alleged "Added Scope of Work," as referenced in paragraphs 31-35 of the Complaint.

**ANSWER**:

14.     State all facts and identify all documents that support the statements made in paragraphs 36 and 58 of the Complaint.

**ANSWER**:

15.     State all facts and identify all documents that support the statements, found in paragraph 39 of the Complaint, concerning the alleged "assurances" made by the MC Defendants to Hudspeth.

**ANSWER**:

16.     State all facts and identify all documents supporting your claims concerning the actual quantities of asbestos-containing materials that Hudspeth abated from the Project, by type of asbestos-containing material, and by Project phase, floor or room. Include in your answer: (1) a description of the quantities/locations that you believe were outside the scope of work indicated in the Bid Pack #2, if any; (2) a description of the quantities/locations that you believe were outside the scope of the original Subcontract; (3) a description of the quantities/locations that you believe were outside the scope of the original Subcontract but within the scope of the Subcontract, as amended by the various amendments/modifications thereto; and (4) a description of the quantities/locations that you believe were outside the scope of the Subcontract, as amended by the various amendments/modifications thereto.   For those quantities identified as part of (4), above, include all documents relating to any change order request or request/application for payment concerning such quantities.

**ANSWER**:

17.    Fully describe your interpretation of Defendants' position concerning the scope of the Subcontract, as referenced in paragraphs 13, 15-17, 19-22, 25-29, 31, 63 and 67 of the Answer (wherein Hudspeth states ". . . Plaintiff denies Defendants' current position on the scope of the Subcontract as its position is known to Plaintiff.").  Include in your answer a list of all documents you believe to be incorporated into the Subcontract.  To the extent that you contend there are documents that support your interpretation of the Subcontract, identify such documents.

**ANSWER**:

18.    Identify all persons whom you expect to call as witnesses at trial, identifying with specificity those who you intend to call as expert witnesses and all persons with whom you have consulted in an expert capacity with regard to the claims asserted in this civil action, including in your answer: the subject(s) upon which the expert is expected to testify; the substance of the facts and opinions to which each expert is expected to testify and summary of the grounds for each such opinion; the qualification of each expert, listing the schools attended, years of attendance, degrees received, and experience in any particular field of specialization or expertise; the name and address of every expert's present employer, or if self-employed, the name and address of the business and his/her occupation; and the name and address of every employer of each expert for the last ten (10) years and a detailed description of all duties at each place of employment; if the expert was self-employed, state specifically and in detail the description of his duties and responsibilities.

**ANSWER**:

19.   State the full name, address, and position of the person(s) answering these Interrogatories.

**ANSWER**:

Dated: September 18, 2014

J. Douglas Scherling, Esq.
7086 Bell Drive
Colorado Springs, CO 80920
Tel: 719-229-7739
JDScherling@gmail.com

Edward T. DeLisle, Esq.
Maria L. Panichelli, Esq.
Cohen Seglias Pallas Greenhall & Furman, P.C.
United Plaza, 19th Floor
30 South 17th Street
Philadelphia, PA 19103
Tel: 215-564-1700
Fax: 215-564-3066
edelisle@cohenseglias.com
mpanichelli@cohenseglias.com

*Attorneys for Defendants and*
*Counterclaim/Third-Party Plaintiffs*

13

## CERTIFICATE OF SERVICE

I, Edward T. DeLisle, Esquire, do hereby certify that on this 19th day of September, 2014, a true and correct copy of Defendants' First Set of Interrogatories Directed to Plaintiff was served via overnight mail upon the following:

> Reed F. Morris
> Mallon & Lonnquist, LLC
> 3200 Cherry Creek South Drive
> Suite 650
> Denver, CO  80209
>
> Attorney for Plaintiff

/s/ _____
Edward T. DeLisle

# EXHIBIT 2

**From:** Doug [mailto:jdscherling@gmail.com]
**Sent:** Monday, October 27, 2014 4:28 PM
**To:** 'Reed Morris'; Craig Watrous
**Cc:** Edward T. DeLisle; Maria L. Panichelli
**Subject:** RE: MC and Hudspeth Disclosures and Project Files

Reed,
I am back in the office and just wanted to see where we stand on Hudspeth's responses to Defendants' written discovery -- last week you indicated that responses to the Interrogatories would be provided NLT than COB today October 27, 2014.  When I asked about the Request for Production you thought Hudspeth had already provided everything – I included my prior email below as there seem to be significant holes in Hudspeth's disclosures.  I also noted that from their initial disclosures it looked like Hudspeth had only 1 document related to its estimate of the project and that I was certain more existed.  It is important that we inspect Hudspeth's documents as noted in the Request for Production this week as we prepare for depositions so please let me know when we can do so.
Thanks
Doug
J. Douglas "Doug" Scherling, Esq.
7086 Bell Drive
Colorado Springs, CO 80920
(719) 229-7739
JDScherling@gmail.com

This message may contain confidential communications and/or privileged information. If you receive this message in error, please delete it and notify the sender.

**From:** Doug [mailto:jdscherling@gmail.com]
**Sent:** Monday, September 15, 2014 9:11 AM
**To:** 'Reed Morris'; Craig Watrous (CWatrous@mallon-lonnquist.com)
**Cc:** 'Edward T. DeLisle'; 'Maria L. Panichelli'
**Subject:** RE: MC and Hudspeth Disclosures and Project Files

Reed and Craig,

After a more definitive review of Hudspeth's Initial Disclosures I noted the following deficiencies:

      Missing Centerre Amendments 18, 43-50, and 52-54.

      Daily Reports, Daily sin-in sheets, containment sign in/out sheets, toolbox meeting reports for the following periods: July 2011 thru May 23, 2012; June 8-12and 23-29, 2012; July 1, 6-12, and 21 thru November15, 2012; November 18-28 and 30, 2012; December 1,2 13-18, 2012 and August 13, 2013 on.

Certified Payrolls from Hudspeth or any of their on-site subcontractors.

Correspondence: I only find a few emails – generally in support of a change request and few letters – again generally only those in support of a change request.

Thanks
Doug
J. Douglas "Doug" Scherling, Esq.
7086 Bell Drive
Colorado Springs, CO 80920
(719) 229-7739
JDScherling@gmail.com

This message may contain confidential communications and/or privileged information. If you receive this message in error, please delete it and notify the sender.

---

**From:** Doug [mailto:jdscherling@gmail.com]
**Sent:** Monday, August 04, 2014 9:46 AM
**To:** 'Reed Morris'
**Cc:** 'Craig Watrous'; 'Edward T. DeLisle'; 'Maria L. Panichelli'
**Subject:** RE: MC and Hudspeth Disclosures and Project Files

Reed,
Thanks for the update and the additional documents.  I just sent you an email regarding much if this so please disregard those items you have addressed.
I now have MC's/Centerre's updated files through July 25, 2014 as you noted they are voluminous.  I completed the downloading of the files this past weekend – 300+GB.

As far as the page count and the seeming insufficiency of Hudspeth's disclosures Hudspeth was on the project from August of 2011 through August 2013 – 25 months this does not include the bid period nor Hudspeth's "closeout" period.  Hudspeth had at least five subcontractors providing labor on this project and it appears a number of other subcontracts for disposal etc.  Further if I understood correctly, despite the disclaimers, the File Map/Tree you provided on April 15, 2014 was a complete listing of Hudspeth's electronic files for the project and Hudspeth's disclosure documents on the thumb drive subsequently sent to Ed's office were copies of all the electronic documents in those files, absent anything privileged and most of the emails.  Please let me know if I have misunderstood.

There were a couple of other items mostly associated with efforts toward meaningful settlement discussions and Hudspeth's damages in my email sent earlier today – trust those will be placed on a front burner so we can stay on track.

Again Reed, thanks for the update,
Doug
J. Douglas "Doug" Scherling, Esq.
7086 Bell Drive
Colorado Springs, CO 80920
(719) 229-7739
JDScherling@gmail.com

This message may contain confidential communications and/or privileged information. If you receive this message in error, please delete it and notify the sender.

**From:** Reed Morris [mailto:RMorris@mallon-lonnquist.com]
**Sent:** Monday, August 04, 2014 8:38 AM
**To:** Doug
**Cc:** Craig Watrous; Edward T. DeLisle; Maria L. Panichelli
**Subject:** RE: MC and Hudspeth Disclosures and Project Files

Doug,

I never said it was a "few" emails.  I think it's more along the lines of "most" emails, the page count on which I have yet to discern but they will be disclosed later in the week.  Maybe once you have those it will be more clear.  I understand you are in the same boat in that I am also to expect "most" emails to be still forthcoming from MC.

Generally, I find that measuring the substance of disclosures by pure volume to be a waste of time.   I believe what I have, and what has been disclosed, to be the substance of Hudspeth's file (less emails), but will be reviewing your email with my client later today.  I can assure you that I will not review the 10,000 pages and expect it to come to mind the dozens(?) or thousands (?) of pages that you indicate might be missing by page count alone.  If there is a category of documents or a reason why off the top of your head (other than emails) that the 2,500 or 3,000 original pages you count seems inadequate, understanding that  would be more useful to me.  If its rough math on volume, I can say that nothing from MC's disclosures surprised me--I expected it to be no less than an order of magnitude greater than Hudspeth's given MC's role relative to Hudspeth's on the project.  You're welcome to stop buy again, and I'd be happy to walk you through Hudspeth's file as you kindly did for me with MC.

I owe you a table of contents by Bates for the file tree which is in production.

I am attaching 5326-5725.  They were obviously accounted for and bate-stamped, but I have no explanation as to why they were not included.

Thank you for noting the overlap of the page numbers.   Perhaps we will renumber them 5967.0 and 5967.1

Reed

REED F. MORRIS
Direct: (303) 927-0011

 MALLON LONNQUIST
MORRIS & WATROUS

3200 Cherry Creek South Drive, Suite 650
Denver, CO 80209
Main:  (303) 777-1411
rmorris@mlmw-law.com
www.mlmw-law.com

This email may contain privileged and confidential information.  If you are not the intended recipient, you are instructed to delete it and notify us immediately.

**From:** Doug [mailto:jdscherling@gmail.com]
**Sent:** Monday, July 28, 2014 12:20 PM
**To:** Reed Morris
**Cc:** Craig Watrous; Edward T. DeLisle; Maria L. Panichelli
**Subject:** MC and Hudspeth Disclosures and Project Files

Reed:

While waiting for MC/Centerre to up-to-date the NCH project files and emails I have been reviewing Hudspeth Disclosures and based on my review, so far, I have a couple of concerns.

Hudspeth Disclosures:
1.) The files/documents Bates Stamped 5326 thru 5725 (400 total) are missing from the disclosures.
2.) Just a note (likely won't be an issue) your Bates Stamp 7967 is on two different documents.
3.) It appears that the only emails, scattered throughout the Hudspeth Disclosure, are those exchanged between Hudspeth and MC/Centerre.

It also looks like the GSA Contract drawings and specification (both the 60% and 100% sets), photos, MC's REA dated June 28, 2013, and MC's February 12, 2014 Request for a Contracting Officer's Final Decision make up about 60% of the Hudspeth disclosures.  Further if I included duplicated files, blank forms, employee certs and ID information, and the Walsh Negative Exposure Assessment Plan that percentage would likely go up to 70-75% -- effectively meaning that Hudspeth prepared documents as disclosed would include at the most 2500-3000 pages.

Reed, I had understood from our recent conversations that you believed Hudspeth's disclosures to be their complete project record except for a few emails.  I think if you review Hudspeth's disclosures you will find that there is much more missing than just a few emails.

As I press forward with making MC/Centerre's project files up-to-date I think you also need to review Hudspeth's files to ensure that they are both up-to-date and complete.  Also if you can prioritize those files, the ones you identify from the MC File Map/Tree, that will help me focus on those files first.  Please send at your earliest, even if it just your first "cut" through the File Map/Tree.

Based on the above our concurrent efforts to exchange complete files by the end of this month (Thursday of this week) is overly optimistic -- I am sure it will take longer than we originally thought.

Thanks
Doug

J. Douglas "Doug" Scherling, Esq.
7086 Bell Drive
Colorado Springs, CO 80920
(719) 229-7739
JDScherling@gmail.com

This message may contain confidential communications and/or privileged information. If you receive this message in error, please delete it and notify the sender.

# EXHIBIT 3

*The Law Firm of J. Douglas Scherling*

November 4, 2014

Reed Morris, Esq.
Craig Watrous, Esq.
Mallon & Lonnquist, LLC
3200 Cherry Creek South Drive, Suite 650
Denver, CO  80209

**Sent via email only to: <u>rmorris@mallon-lonnquist.com</u>, and
<u>CWatrous@mallon-lonnquist.com</u>**

RE:  Hudspeth v. MC, et.al.,  Case No. 1:14-cv-00087

Subject: Defendants' First Set of Requests for the Production of Documents Directed to the
Plaintiff sent September 19, 2014 and delivery September 22, 2014.

Dear Reed:

I had hoped to see Hudspeth's response to the above subject Request for Production of
Documents when I got to the office this morning.  We have discussed over the past few weeks
Hudspeth's response and I understood and agreed to extend your response until close of business
yesterday.  A formal response is needed immediately as any further delay will negatively impact
our schedule.

As always please contact either Ed or me if you have any questions or concerns regarding this
case.

Sincerely,

/s/ J. Douglas Scherling

J. Douglas Scherling
Attorney for Defendants

# EXHIBIT 4

*The Law Firm of J. Douglas Scherling*

December 16, 2014

Reed Morris, Esq.
Craig Watrous, Esq.
Mallon & Lonnquist, LLC
3200 Cherry Creek South Drive, Suite 650
Denver, CO 80209

**Sent via email only to: rmorris@mallon-lonnquist.com, and
CWatrous@mallon-lonnquist.com**

RE: Hudspeth v. MC, et.al., Case No. 1:14-cv-00087

Subject: Defendants' First Set of Requests for the Production of Documents Directed to the Plaintiff sent September 19, 2014 and delivered September 22, 2014.

Dear Reed:

I finally completed a review of the documents you provided in response to the subject Request and have not seen any additional documents associated with Hudspeth's bid/estimate for this project; documents specifically requested in our Requests 2 and 3.

I have also not been able to locate any of the notifications Hudspeth sent to Walsh (or MC/Centerre) regarding discrepancies between the approximate quantities of ACM shown in the Subcontract documents and those actually encountered/abated. This notification was required under Specification Section 02 80 13 (H&A-002273); see Request for Production 8.

Further I have not found any documents reflecting Hudspeth's claim(s), including any Hudspeth certified claim(s); Request 13.

Reed, while there are other deficiencies in your responses to the Request for Production, Ed and I consider the above the most time sensitive and request your immediate attention to these items. If I have overlooked these documents in your response please identify them by the Bates Stamp number; however, if they have not been provided please provide these documents immediately.

As always please contact either Ed or me if you have any questions or concerns regarding this case.

Sincerely,

J. Douglas Scherling
Attorney for Defendants

Attached excerpt from Defendants' Request for Production for reference only

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-00087 CMA-KMT

---

### DEFENDANTS' FIRST SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS DIRECTED TO THE PLAINTIFF

---

2.      Identify and produce any and all documents reflecting your analysis concerning the location and/or amount of asbestos-containing materials you were required to remove pursuant to Bid Pack #2, and the location and/or amount of asbestos-containing materials you were required to remove pursuant to the Subcontract (prior to any amendments or modifications), including, but not limited to, any documents concerning your analysis of the Walsh Report, demolition drawings, and/or the Walsh Abatement Master Specifications.

3.      Identify and produce all documents consulted, reviewed, or otherwise used to prepare Hudspeth's bid for the Subcontract/Hudspeth's response to Bid Pack #2, including, but not limited to, any and all documents supporting your calculation of unit rates, and your "Base Bid Abatement Total of $739,514.00." Include in your answer any and all documents relating to the document produced by you as part of your Initial Disclosures, Bates Stamped H&A-004426.

5.      Identify and produce any and all documents containing any and all communications between you and any party, person or entity to whom you subcontracted the performance of work required by the Subcontract.

8.      Identify and produce any and all documents that support the statement, made in paragraph 26 of the Complaint, that the Walsh Report significantly understated the asbestos to be abated throughout the Project, **including, but not limited to, any and**

**all written notifications sent to Walsh and/or the MC Defendants concerning discrepancies between the approximated quantities of asbestos-containing materials shown in the Subcontract documents and the actual quantities of asbestos-containing materials requiring removal/abatement.**

13.     Identify and produce any and all documents relating to any requests for equitable adjustment or claim(s), certified or otherwise, prepared and submitted by or for Hudspeth on this Project.

# EXHIBIT 5

# EXHIBIT 3
## Deposition Excerpts

United States of America, et al. v.
Centerre Construction, et al.

Daniel Moss
December 18, 2014

Page 165

1 Q. And that's the accounting system that you
2 refer to as "PIFF," the P-I-F-F?
3 A. No. The PIFF was the spreadsheet that we
4 used to track costs.
5 Q. To track costs?
6 A. Yes.
7 Q. Okay. What do you use for an accounting
8 system at Hudspeth?
9 A. Sage.
10 Q. Did you have anything to do with the
11 original estimate on this project?
12 A. No.
13 Q. But you did prepare estimates for some of
14 the change order requests on this project?
15 A. I believe all our change order requests
16 were based on unit rates associated to the quantities
17 of the material. There was some T&M on things we did
18 for Walsh related to the FA, but actual lump sum bids
19 for anything, I don't recall ever doing it for a
20 change order.
21 Q. You didn't provide a change order for,
22 say, trace plaster removal?
23 A. That was based on a unit rate.
24 Q. Okay. Did you provide change order
25 requests for additional penetrations that may be

Page 166

1 required by a subcontractor?
2 A. Yes. That was also based on a unit rate.
3 Q. So there was a unit rate per penetration?
4 A. I believe -- if I remember correctly, it
5 was based on square footage. That was prepared by
6 Chris Condon previous to my involvement at the
7 project.
8 Q. So the extent of your -- what I would
9 call estimating of this job was simply quantities
10 times unit rates?
11 A. I wouldn't even call it estimating. I
12 would call it putting data together.
13 Q. Okay.
14    (Deposition Exhibit 117 was marked.)
15 Q. Can you identify -- I have just placed
16 before you Exhibit 117. Can you identify this
17 document?
18 A. This is the PIFF that I was referring to.
19 Q. And you're not sure what PIFF refers to,
20 but this is --
21 A. I can't remember.
22 Q. Okay. But this is commonly known within
23 the Hudspeth community as a "PIFF"?
24 A. Yes.
25 Q. And that's P-I-F-F?

Page 167

1 A. Yes.
2 Q. Is this a document that you would use for
3 budgeting work on the New Customs House project?
4 A. Yes.
5 Q. Is this a report that you would use for
6 tracking costs on the New Customs House project?
7 A. This was a spreadsheet for tracking
8 costs, yes.
9 Q. You're familiar with this spreadsheet?
10 A. Yes.
11 Q. I would like you to look at the first
12 page of Exhibit 117. About halfway down the sheet on
13 the left-hand side, it says "Project Budget." Do you
14 see that?
15 A. Yes.
16 Q. Can you tell me what -- and I assume
17 that's a title for the following -- strike that.
18    Does that identify what follows -- on the
19 bottom of that page following onto the next?
20 A. Yes.
21 Q. Is this a total budget for the project?
22 A. Yes, it is.
23 Q. I don't want to trick you. I just want
24 you to look at it and make sure that that's your
25 understanding. I'll just convey to you that I see

Page 168

1 Phase III, Phase IV and Phase V.
2 A. No. This was most likely -- as I said
3 before, the budget came into effect when I took over
4 the project, so these would be phases that I had
5 involvement in or ran.
6 Q. Do you have any understanding as to how
7 the budget was maintained prior to your arrival?
8 A. I don't have any knowledge of that.
9 Q. Who would?
10 A. My guess would be Chris Condon or any of
11 the other assistant PMs at the time that were on the
12 same floor that I was in.
13 Q. Do the budgets for Phase III, Phase IV
14 and Phase V -- do those appear to be budgets that you
15 helped establish?
16 A. They appear to be.
17 Q. Were they budgets you established?
18 A. Yes. I will say these were frequently
19 changed based on change orders and project costs.
20 They were not set in stone budgets.
21 Q. Can you tell me the date of this PIFF?
22 A. I cannot.
23 Q. Did you have input into the table in the
24 upper right-hand corner with regard to profit,
25 overhead, total cost, total project cost, contingency?

United States of America, et al. v.
Centerre Construction, et al.

Daniel Moss
December 18, 2014

Page 181

1   Phase III for the first floor?
2   A.   Can you repeat that?  Sorry.
3   Q.   Well, you had mentioned that Justin Mast
4   and you were both involved on the third floor?
5   A.   Correct.
6   Q.   But by the time you hit the first floor,
7   you took over all of the assistant project management
8   duties?
9   A.   Yes.
10  Q.   So how did you prepare your budget for
11  the first floor?
12  A.   I don't remember.  Like I said before, I
13  believe it was once I received costs of a certain
14  area, I built it based on that cost is what I believe
15  I did.  I don't remember exactly how I started out.
16  It's possible that Chris had given me a budget number
17  to try to use for that floor.  I don't remember.
18      MR. SCHERLING: We're close.
19  Five minutes.
20      MR. MORRIS: Five-minute break?
21      MR. SCHERLING: Five-minute break and
22  then I think we'll be able to wrap up quickly.
23      (Recess taken, 3:52 p.m. to 3:56 p.m.)
24  Q.   (BY MR. SCHERLING)  I will have you look
25  at Exhibit 39 real quick.  Have you ever seen this

Page 182

1   exhibit before?
2   A.   Yes.
3   Q.   What is that?
4   A.   This looks like to me to be a summary tab on a
5   spreadsheet we used to use for putting bids together.
6   Q.   So this is a summary tab.  So it would
7   have accumulated information from other tabs.
8   A.   I would guess that's what this is.
9   Q.   You're familiar with the term "roll up"
10  with numbers?
11  A.   Yes.
12  Q.   Would other numbers have rolled up into
13  this?
14  A.   I believe so.  That's what it looks like.
15  Q.   And that's the system that was in place
16  at the time this project was bid, as far as you know?
17  A.   At that time, there was various systems
18  for various people.  It was a standardized system for
19  putting the estimates together, so I've seen this.
20  Q.   Do you recognize this as being a part of
21  the New Customs House project?
22  A.   I couldn't say that I recognize it being
23  part of the project, no.
24  Q.   If you would look at the total there and
25  compare that with the total on Exhibit 7 for the base

Page 183

1   bid abatement, would that help you --
2   A.   It appears those numbers match.
3   Q.   Okay.  So based on that, would you assume
4   that this was one of the summary sheets used in the
5   estimate for the New Customs House?
6   A.   It appears that way.
7   Q.   We talked briefly about the trench in the
8   basement of the New Customs House, the demolition of
9   it.
10  A.   Yes.
11  Q.   I'm trying to remember.  Did you indicate
12  that Hudspeth completed the demolition of the trench?
13  A.   No.  We completed the abatement
14  associated with the trench.
15  Q.   Do you recall if the trench was required
16  as a part of your contract with Centerre -- Hudspeth's
17  contract with Centerre?
18  A.   I was told that it is not part of our
19  contract and it was undefined what the scope even was
20  at that time by the field personnel.  They were
21  uncertain how the build back would even take place.
22  Q.   Do you know who would have told you that
23  it was not a part of the contract?
24  A.   Chris Condon.
25  Q.   And he told you it was not a part of the

Page 184

1   contract?
2   A.   Yes.
3      (Deposition Exhibit 118 was marked.)
4   Q.   I'm handing you what has been marked as
5   118.  There is an e-mail at the top of this exhibit
6   that's from you to Chris Condon in May of 2013; is
7   that correct?
8   A.   Yes.
9   Q.   And does that refresh your memory as to
10  what Chris Condon told you with regard to the trench?
11  A.   I guess so.
12  Q.   So would you change your testimony that
13  Chris, in fact, told you that the trench was a part of
14  your contract?
15  A.   It looks like it was a question.  It
16  doesn't -- it looks like it was unclear if it was or
17  wasn't.  So, you know, after this, he could have told
18  me.  I'm not sure.
19  Q.   I'll have you go to Exhibit 42 and turn
20  to page MC0011493.  I will direct your attention to
21  item 39.  Does that help you understand whether or not
22  the trench was a part of Hudspeth's contract?
23  A.   Yes, it does, and maybe he was referring
24  to the undefined scope of how that was to be done and
25  completed, because I know that was a question in the

United States of America, et al. v.
Centerre Construction, et al.

Daniel Moss
December 19, 2014

---

Page 17

1  exhibits -- you've provided them.  I assume there is
2  no --
3      MR. MORRIS: If I may for the record
4  offer this, and tell me -- I had reviewed these
5  spreadsheets.  I would say there may be work product
6  or what would be considered work product that was part
7  of those discussions related to what this spreadsheet
8  shows or ought to show in helping my client prepare
9  for this deposition.
10      By providing -- let me know if you agree
11  to this, Mr. Scherling.  By providing these documents,
12  we're not taking the position that they are work
13  product.  However, I'm not waiving any work product or
14  attorney-client privilege by merely preparing my
15  client for this deposition, a process that involved
16  undertaking a comprehensive review of its billing
17  systems and my client producing these spreadsheets as
18  a result of that.  Is that fair?
19      MR. SCHERLING: I think it's fair, or I
20  understand where you're at.  If I were to ask for who
21  provided what input, that would certainly be something
22  that you would --
23      MR. MORRIS: Of course, in any case,
24  there is input provided by counsel.  You're not
25  entitled to know what input I provided or not, but I

---

Page 18

1  don't think by providing these spreadsheets there has
2  been any waiver.  By merely indicating that I was part
3  of the preparation of my client for a 30(b)(6) I don't
4  think waives privilege.  And these spreadsheets, as
5  testified to by Mr. Moss, were prepared by Hudspeth.
6  The primary undertaking of which I believe is also
7  consistent with his testimony was Katy Amann.
8      MR. SCHERLING: Is there any privilege to
9  any of the conversation that absent you -- well, not
10  absent -- with you present was discussed amongst the
11  team that put this together?
12      MR. MORRIS: That would be privileged.
13      MR. SCHERLING: That would be privileged.
14      MR. MORRIS: But I don't believe there
15  was -- well, you can certainly ask him if the
16  preparation of this resulted out of any conversations.
17  I think the need, certainly, Mr. Scherling, for the
18  preparation of this and preparation of Hudspeth for
19  this deposition resulted in the preparation of this
20  document.
21      MR. SCHERLING: I understand.  As I
22  understand, these were prepared in collaboration with
23  a team of which you were a member of that team?
24      MR. MORRIS: From time to time, I did
25  meet with my client in preparation for this exhibit --

---

Page 19

1  I'm sorry -- in preparation for this deposition.
2      MR. SCHERLING: If I were to ask Mr. Moss
3  what input Katy Amann might have had or what input
4  Chris Condon may have had, would you consider that to
5  be --
6      MR. MORRIS: If it came from me, then
7  yes.
8      MR. SCHERLING: That you would be
9  conveying the information for them?
10      MR. MORRIS: Sure.
11      MR. SCHERLING: Okay.
12      MR. MORRIS: You're absolutely free to
13  ask Mr. Moss about what input he provided, what
14  input -- about his discussions with Ms. Amann, whether
15  he had discussions with Ms. Amann without me present.
16  He may answer that one way or the other and what those
17  discussions were.  That certainly wouldn't be
18  privileged.
19  Q.  (BY MR. SCHERLING) Mr. Moss, do I
20  understand that Exhibits 128 through 131 were prepared
21  through a number of people that work with Hudspeth?
22  A.  Correct.
23  Q.  There was kind of a team put together to
24  provide this information in this form?
25  A.  We came together to put this information

---

Page 20

1  together, yes.
2  Q.  Okay.  And that team consisted of, as far
3  as Hudspeth personnel, Katy Amann, you, Chris Condon.
4  Were there any others involved?
5  A.  I don't believe so.
6  Q.  Did Rob Levitt have any input on this?
7  A.  I wouldn't say that he didn't have input.
8  The primary task was undertaken by Katy Amann, Chris
9  and myself.  I do not know if he had input or not.
10  Q.  Okay.  I think we have identified 128 and
11  129.  130, can you identify that document?
12  A.  As I said before, it's change orders for
13  amendments issued.
14  Q.  And by "change order," are you using that
15  synonymous with amendment?
16  A.  I'm not sure what you mean by that.
17  Q.  Well, you have a column head that is
18  "Contract/Change Order."  I don't see anything in the
19  column that indicates change order nor contract.  I do
20  see a statement that identifies amendments.
21      MR. MORRIS: Form.
22  Q.  (BY MR. SCHERLING) What do you mean by
23  Amendment 1 on Exhibit 130?
24  A.  Amendment 1 was an amendment issued by
25  MC.

---

United States of America, et al. v.
Centerre Construction, et al.

Daniel Moss
December 19, 2014

Page 49

1  Q.   And it's an application for payment on
2   this project?
3  A.   It appears so.
4  Q.   Is there anything on it that would give
5   any other appearance?
6  A.   Not at this time.
7  Q.   Do you think at some time in the future
8   we might have a different appearance?
9       MR. MORRIS: We haven't seen Exhibit 137
10  yet, Mr. Scherling.
11  Q.   (BY MR. SCHERLING) But 136 won't change,
12   as far as you know?
13  A.   The exhibit will not change, no.
14  Q.   Very good.  This was a pay application
15   submitted by Hudspeth to Centerre; is that correct?
16  A.   It looks like it is.
17  Q.   You can go ahead and review this, if you
18   would like to.  Exhibit 136, does it represent pay
19   application No. 19?
20  A.   It looks like it does.
21  Q.   What gives you the impression that it's
22   pay application 19?
23  A.   The line that states "Invoice/Application
24   No." shows 19.
25  Q.   Okay.  So your belief is this is pay

Page 50

1   application No. 19?
2  A.   It appears so.
3  Q.   And would you have provided the
4   supporting information found on the schedule of
5   values, pages 2 through 9, for this application for
6   payment?
7  A.   Yes.
8  Q.   And Katy Amann would have prepared the
9   actual application for payment, which is the first
10   page of Exhibit 136?
11  A.   Correct.
12  Q.   Do you consider this to be an accurate
13   pay application?
14  A.   I cannot verify the accuracy of the
15   documents you're putting in front of me without
16   looking at what was actually in our accounting system
17   for pay application.
18       If you're asking me if I remember every
19   single line item out of 124 line items on each pay
20   application and the date that you're referencing for
21   each one, no, I do not remember exactly each dollar
22   value associated with that at this time or at any
23   times on each application.
24       At the time of submission, yes, it was
25   believed that these were accurate representations of

Page 51

1   what we wanted to bill for and what was requested, of
2   course.
3  Q.   So is it your belief it was accurate at
4   the time this was submitted?
5  A.   If this is, in fact, what was submitted,
6   yes.
7  Q.   So you don't know whether or not this was
8   actually submitted on this project?
9  A.   I cannot verify the dollar value that's
10   represented here without knowing what was submitted in
11   our accounting system.  I cannot verify the accuracy
12   of what was submitted.
13  Q.   So what would you need to verify the
14   accuracy of these pay applications?
15  A.   To know the dollar value associated with
16   each pay application in our accounting system.  I
17   cannot verify that this document in front of me is the
18   authentic pay application that we submitted.
19       MR. SCHERLING: Can we get copies of
20   the -- we can go off the record.
21   (Discussion off the record.)
22       MR. SCHERLING: Back on the record.
23       MR. MORRIS: What are you asking for?
24       MR. SCHERLING: Mr. Morris, we have
25   discussed my request for the accounting data that

Page 52

1   Mr. Moss has indicated he would need to verify the
2   accuracy of pay applications submitted on this
3   project.  Is that information that you'll provide?
4       MR. MORRIS: Let me ask a follow-up
5   question of Mr. Moss.
6       Mr. Moss, is your inability to answer
7   Mr. Scherling's question because you don't know
8   whether Exhibit 136 that was put in front of you by
9   him was the actual pay app that was submitted to MC?
10       THE DEPONENT: Correct.
11       MR. MORRIS: No.
12       MR. SCHERLING: My question remains.
13       MR. MORRIS: And the answer is no.
14  Q.   (BY MR. SCHERLING) Have you provided all
15   of the information that's available on this project?
16       MR. MORRIS: What are you asking about
17   specifically?
18       MR. SCHERLING: I'm specifically asking
19   about the information that would validate and verify
20   the accuracy of the pay applications submitted by
21   Hudspeth to Centerre on this project.
22       MR. MORRIS: Mr. Scherling, you're
23   misunderstanding Mr. Moss' testimony.  I just
24   clarified it, and if you would have listened to the
25   answer, you would have understood.

United States of America, et al. v.
Centerre Construction, et al.

**Daniel Moss**
**December 19, 2014**

Page 53

1    MR. SCHERLING: Okay.
2    MR. MORRIS: What you're asking him, as I
3  understand it, is to assume that 136 was the pay app
4  that was submitted from Hudspeth to MC.  Based on what
5  has happened already this morning, you've put pay apps
6  in front of him and then you've put a revised pay app
7  in front of him, and there may be more of those to
8  come.
9    If you're asking him to assume -- he
10  doesn't have in front of him the number that was
11  submitted.  If he had the number that was submitted
12  from our system and could compare it to 136, that
13  would probably change the answer to your question.
14  It's not that there is additional backup information
15  or other things that would verify its accuracy.
16    MR. SCHERLING: Well, you just indicated
17  there was information that he could look in the system
18  and verify it.  I need that information from the
19  system so that he can verify that these are accurate.
20    MR. MORRIS: The only issue that --
21  you're not listening.  The only issue that Mr. Moss
22  has, and he can correct me if I'm wrong, is that
23  you're asking him to assume that 136 was submitted to
24  MC.
25    MR. SCHERLING: I'm not asking him to

Page 54

1  assume anything.  This is a document that you
2  provided.
3    MR. MORRIS: Mr. Scherling, can I finish?
4    MR. SCHERLING: Sure.
5    MR. MORRIS: I asked Mr. Moss a simple
6  follow-up question.  Your question is about accuracy.
7  Mr. Moss' limited ability and the only limited ability
8  to answer your question on accuracy is because he does
9  not trust your putting Exhibit 136 in front of him --
10  that that 136 was actually submitted to MC.  If you
11  want him to assume that fact for the basis of your
12  questions, then ask him to assume that fact and
13  proceed.
14    MR. SCHERLING: Are you done?
15    MR. MORRIS: I'm done.
16    MR. SCHERLING: Okay.
17  Q.  (BY MR. SCHERLING)  Mr. Moss, I would
18  like you to go back and review Exhibits 132, 133, 134,
19  135 and 136.
20  A.  Can you repeat those?
21  Q.  132 through 136, I believe.  Do you know
22  if any of those were submitted to Centerre on this
23  project?
24  A.  It appears that they were.  I cannot
25  verify that these specific documents are what was

Page 55

1  submitted as final documents.
2  Q.  You do understand that this is a 30(b)(6)
3  deposition and you're the corporate representative who
4  has been designated to answer my questions with regard
5  to pay applications?
6  A.  Yes.
7  Q.  And if I ask you if you submitted those
8  or if they're accurate, would I be out of line doing
9  that?
10  A.  Can you repeat the question?
11  Q.  We'll skip that question.
12    Is there a reason that you cannot respond
13  to my questions with regard to whether or not these
14  individual pay applications were submitted on this
15  project?
16  A.  I've given you a reason why I cannot
17  verify these documents were submitted as these numbers
18  are shown here.
19  Q.  And what would it take for you to verify
20  that these documents were actually submitted by
21  Hudspeth to Centerre on this project?
22  A.  I would have to look at these dollar
23  amounts that are on these exhibits and verify what was
24  actually submitted to MC.
25  Q.  And the verification of the actual

Page 56

1  submission would come from what document?
2  A.  It would come from our accounting system,
3  as I stated before.
4    MR. MORRIS: Can we go off the record for
5  a second?  Is that okay with you?
6    MR. SCHERLING: Yeah, we can go off the
7  record.
8    (Discussion off the record.)
9    MR. SCHERLING: We are back on the
10  record.
11    The record can reflect that Mr. Morris
12  and I had a conference in the hall, which, I believe,
13  was productive.
14  Q.  (BY MR. SCHERLING)  We're back on the
15  record.  You understand you're still under oath?
16  A.  Yes.
17    (Deposition Exhibit 137 was marked.)
18  Q.  Mr. Moss, you've been handed what's been
19  marked as Deposition Exhibit 137.  Can you identify
20  this document?
21  A.  It appears to be an application for
22  payment.
23  Q.  On this project?
24  A.  It appears so.
25  Q.  And it was submitted -- do you know if

# EXHIBIT 6

*The Law Firm of J. Douglas Scherling*

December 23, 2014

Reed Morris, Esq.
Craig Watrous, Esq.
Mallon & Lonnquist, LLC
3200 Cherry Creek South Drive, Suite 650
Denver, CO 80209

**Sent via email only**

RE:  Hudspeth v. MC, et.al.,  Case No. 1:14-cv-00087

Subject:  Hudspeth's hand-written copy of the Bid Pack #2 Bid Form
          Defendants' First Set of Requests for the Production of Documents Directed to the
          Plaintiff sent September 19, 2014 and delivered September 22, 2014.

Dear Reed:

Last week before the deposition of Dan Moss you handed me a copy of a hand-written Bid Pack #2 Bid Form, containing the amounts as reflected in Hudspeth's typed Bid Form, and advised that this was Hudspeth's "estimate" provided in response to my recent letter; i.e., sent December 16, 2011. I advised you then and repeat now this is not an estimate and is neither responsive to my letter nor responsive to the subject Defendants' First Set of Requests for Production (Request). You also reiterated your prior position that Hudspeth had provided all of the documents in its possession related to this case. If that is true please provide a letter so stating, as Defendants and their counsel, Ed DeLisle and I, do not believe everything has been provided.

I have again reviewed the documents you provided in response to the subject Request and have not seen any additional documents associated with Hudspeth's bid/estimate for this project; documents specifically requested in our Requests 2 and 3. Further, I have not found any notifications Hudspeth sent to Walsh (or MC/Centerre) regarding discrepancies between the approximate quantities of ACM shown in the Subcontract documents and those actually encountered/abated. This notification(s) was required under Specification Section 02 80 13 (H&A-002273); see Request for Production 8. In addition I have not found any documents reflecting Hudspeth's claim(s), including any Hudspeth certified claim(s); Request 13.

Reed, now that the FRCP 30(b)(6) depositions have been completed it appears that Mr. Moss reviewed documents during his preparation of the "new" damages amounts that have not been produced; see Request 18. You did provide a few documents that might meet these requirements but you have failed to provide all documents which clearly must exist.

Reed, there are other deficiencies in your responses to the Request for Production; however, both Ed and I consider the above items as requiring your immediate attention. Please provide these documents immediately and then please review you prior responses and if other documents need to be produced please do so immediately thereafter.

If it is your position and you maintain that everything has been provided please forward a letter confirming that you and Hudspeth have provided everything required in response to the Request and as required by the Rules.

As always please contact either Ed or me if you have any questions or concerns regarding this case.

Sincerely,

J. Douglas Scherling
Attorney for Defendants

Attached 3 pages of Hudspeth's hand-written Bid Pack #2 Bid Form

#377

# DEMOLITION AND ASBESTOS ABATEMENT BID FORM

## UNITED STATES NEW CUSTOMS HOUSE MODERNIZATION
## OVERALL PHASE

### BID PACK #2

The project consists of demolition and removal of asbestos-containing materials from the United States Customs House throughout the planned modernization. Details regarding the required abatement activities are presented in the document entitled *Asbestos Abatement Summary of Work* dated June 17, 2011 and the *Walsh Abatement Master Specifications* prepared by Walsh Environmental Scientists and Engineers, LLC dated June, 17, 2011. The selected contractor will be required to enter into a contractual agreement with Matsuo-Centerre Construction. The tentative project schedule is provided in the specifications.

Bidders shall provide a lump sum price for the removal of all selected areas of asbestos-containing materials in accordance with the procedures required in the above-referenced project design specifications. Bidders shall also provide a list of variances that will be requested and proposed cost saving measures for the project in the spaces provided in this bid form.

Referencing the above-mentioned project design document prepared for this project, we hereby submit our bid in the amount stated in the blank of this bid form. Also the undersigned Bidder, having become thoroughly familiar with the terms and conditions of the document and with local conditions affecting performance and cost of the work at the place where the work is to be done, and having fully inspected the site in all particulars, hereby proposes and agrees to fully perform the work within the proposed schedule and by the specified deadline and in strict accordance with the contract for the following sum of money:

DEMOLITION AND REMOVAL OF ACM AS SPECIFIED IN ABOVE REFERENCED PROJECT DESIGN:

Lump Sum Price for Demolition and Removal of Specified Asbestos-Containing Materials:

United States New Customs House

| | | |
|---|---|---|
| Base Bid Demolition | TOTAL ($ | 421,595 ) |
| 2nd Floor Breakout Demolition Items | TOTAL ($ | 18,084 ) |
| Base Bid Abatement | TOTAL ($ | 739,514 ) |
| Alternate 001 Bid Bond (Bond Rate 1.3 %) | TOTAL ($ | 8% ) |
| Alternate 002 Provide APM per Reg. 8 | TOTAL ($ | 20,000 ) |
| Alternate 003 Plaster Demo at NE Penthouse | TOTAL ($ | 1,419 ) |
| Alternate 004 Strip wall covering at 2nd Floor | TOTAL ($ | 4,463 ) |
| Alternate 005 Demolition of Doors to meet Code | TOTAL ($ | 625 ) |

Bids include all labor, materials, services, equipment, insurance, bonds, security, etc. necessary for the completion of the work. The above listed price shall not be exceeded without approval by Matsuo-Centerre in the form of an approved change order request. Matsuo-Centerre reserves the right to accept any or all of the bid items. By requesting bids for the above-listed item, Matsuo-Centerre is not in any way obligated to award or conduct the projects.



**Matsuo - Centerre**
Engineering Construction
A Joint Venture

## UNIT RATES

Include costs for unit rates as indicated below. Assume you will already be onsite for determining your rates. If a mobilization is required to accomplish work using unit rates, the cost for mobilization will be added to the appropriate rate. Activities specified in the unit rates will be completed in accordance with the procedures outlined in these specifications and Colorado Regulation No. 8, Part B. Unit rates will be used to adjust the total project cost in the event of an increase or decrease in work activities included in the original scope of work. The unit rate cost for construction of a containment required for removal of additional materials will be added to the applicable unit rates for the specific material to be removed. Therefore, do not include the cost for containment construction in the costs for removal of additional materials.

Cost for demolition at condensate piping pockets 18" wide by 12 LF height. This unit pricing is intended to be added or subtracted from the quantity of plaster removal for the condensate pockets listed above. Price demolition of plaster at one pocket (per each):

($ 50 per ea)

Cost for abatement of piping insulation and fittings at condensate piping pockets (per LF)
($ 40 per LF)

Cost to remove and properly dispose of Bakelite Fuse Boards (per each).
($ 50 per ea)

Cost to remove and properly dispose of fuses/buses (per each):
($ 20 per ea)

Cost to remove and properly dispose of window caulking (per linear foot):
($ 7 per lf)

Cost to remove and properly dispose of ceiling tiles (per square foot):
($ 9.50 per ft²)

Cost to remove and properly dispose of ceiling tile adhesive (per square foot)
($ 4.25 per ft²)

Cost to remove and properly dispose of duct sealant (per linear foot):
($ 12.50 per lf)

Cost to remove and properly dispose of floor tile and associated mastic (per square foot):
($ 5.75 per ft²)

Cost to remove and properly dispose of lay-in ceiling panels (per square foot):
($ 10.75 per ft²)

Cost to remove and properly dispose of joint compound on drywall (per square foot):
($ 7.40 per ft²)

Cost to remove and properly dispose of adhesive (per square foot):
($ 4.00 per ft²)

Cost to remove and properly dispose of pipe fittings (per each):
($ 50.00 per ea)

Cost to remove and properly dispose of pipe insulation (per linear foot):
($ 47.00 per lf)

Cost to remove and properly dispose of pipe wrap (per linear foot):
($ 47.00 per lf)

**Matsuo · Centerre**
Engineering  Construction
A  Joint  Venture

Cost to construct full containment up to 100 square feet (per 100 ft²) of floor space: ($ 500 per 100 ft²)

Cost to construct full containment between 100 and 500 square feet (per 100 ft²) of floor space: ($ 400 per 100 ft²)

Cost to construct secondary containment up to 100 square feet (per 100 ft²) of floor space: ($ 400 per 100 ft²)

Cost to construct secondary containment between 100 and 500 square feet (per 100 ft²) of floor space ($ 300 per 100 ft²)

Cost for additional mobilization/ demobilization other than those already intended (per event) ($ 3,000 per event)

Cost for supply and haul off of dumpster for ACM containing valves and gaskets (per dumpster) ($ 2,500 per dumpster)

Please provide a list of variances (if any) that you intend to request for the project:

N/A

Please provide a list of cost saving measures (if any) that you intend to implement for the project

N/A

**FIRM NAME AND ADDRESS:**   Hudspeth & Associates, Inc.

4715 S. Santa Fe Circle, Englewood, CO 80110

SIGNED BY: Rob Schimberg                    TITLE: Vice President

SIGNATURE:_____   DATE: 7/5/11

I understand Matsuo-Centerre reserves the right to reject this bid, and that this bid may not be withdrawn for a period of sixty (60) days after the bid opening date. I understand that if awarded the project, I will enter into and execute a contract on the basis of this bid. All work will be accomplished in accordance with contract documents and within specified calendar days after given notice to proceed. I understand that required submittals specified in the Project design document must be submitted upon request by Matsuo-Centerre.

**Matsuo-Centerre**
Engineering  Construction
A  Joint  Venture

# EXHIBIT 7

*The Law Firm of J. Douglas Scherling*

January 13, 2015

Reed Morris, Esq.
Craig Watrous, Esq.
Mallon & Lonnquist, LLC
3200 Cherry Creek South Drive, Suite 650
Denver, CO  80209

**Sent via email only**

RE:  Hudspeth v. MC, et.al.,  Case No. 1:14-cv-00087

Subject:  Hudspeth's "Estimate" Spreadsheet provided via email January 8, 2015
Defendants' First Set of Requests for the Production of Documents Directed to the Plaintiff
sent September 19, 2014 and delivered September 22, 2014
Defendant's FRCP 30(b)(6) Deposition

Dear Reed:

I wanted to acknowledge that Hudspeth did provide the subject "Estimate" spreadsheet last week
which included five (5) tabs which appear to "roll-up" into the Total Cost sheet that was provided
with Hudspeth's initial disclosures.  We remain concerned that this is only a portion of the estimate
used by Hudspeth to prepare its response to Bid Pack #2; note it addresses only Hudspeth's
"abatement" amount and further it does not include any quantities, locations square footages, etc.

I have also completed my initial review of the transcript from the FRCP 30(b)(6) deposition and have
noted numerous instances in which Mr. Moss made reference to information from Hudspeth's
accounting system that he reviewed or used to prepare for this deposition; e.g., Deposition
Transcript: page 7, line 18; page 8, lines23-24; page 15, line 1. Further in your comments noted on
Transcript page 17, lines 16-17 your client undertook a "comprehensive review of its billing
systems". Mr. Moss also indicated on a number of occasions that he could provide answers to my
questions if he could refer to information from Hudspeth's accounting system.

Reed, there are documents we have requested in our request for production that clearly exist and
have not been provided.  We discussed this last week during our telephone conference call and if I
am not mistaken you were going to revisit this with your client.  Pursuant to FRCP 26(e) we are
asking that you immediately supplement your discovery responses.  Further, you indicated that you
would be reviewing Hudspeth's prior disclosures and responses to discovery to ensure that multi-
page documents (we addressed the Hudspeth "Estimate" sheet as an example) were fully disclosed.

We look forward to your supplementing our request for production. However, if it is Hudspeth's
position that everything has been provided please forward a letter confirming that you and Hudspeth
have provided everything required in response to the request and as required by the rules.

As always please contact either Ed or me if you have any questions or concerns regarding this case.

Sincerely,

J. Douglas Scherling
Attorney for Defendants

# EXHIBIT 8

**From:** Reed Morris [mailto:RMorris@mallon-lonnquist.com]
**Sent:** Friday, January 23, 2015 1:29 PM
**To:** Doug Scherling; Craig Watrous
**Cc:** 'Edward T. DeLisle'
**Subject:** RE: Hudspeth v MC matter

Doug,

In response to your last letter, you have misconstrued Mr. Moss's testimony.  The record is clear that "the number" (i.e., the dollar figure in the system associated with a pay request) was the only issue.  You will remember vividly the attempt to cause unnecessary confusion during your examination and Mr. Moss being clear that the "dollar amounts" (55:22-23) associated with the pay requests was the only item he pointed to because of your unreasonable expectation (apparently) that Mr. Moss was to have memorized every number appearing on every document in this case.  It was that context, and that context only, that the "accounting system" was referenced.  As the record also reflects, you and I did have a productive conversation off the record and outside of the deposition room, where I offered you advice on how to get past the hole you had dug yourself into with Mr. Moss so you could obtain the information you needed.

Regarding the other items we discussed on the conference call with Ed, I do recall there was some discussion about internal job cost reporting, but your letter is vague as to what documents you were referring to.  If there are other documents, please advise.  I have reviewed the requests for production you submitted and would ask that you indicate what requests you believe MC asked for job costs tracking information.  Meantime, I understand that such information to the extent it exists and as reflected in the testimony to be not in paper format (i.e., it's in the system, not a stack of weekly or monthly "reports" in a file so to speak), so I could perhaps request that a report be generated.  What was disclosed was as Mr. Moss testified, the sheets where the project manager(s) used for their own field/office records and tracking from time to time.

I have not completed the review of all other spreadsheets to see if there is other pages that were inadvertently omitted from disclosure, but will have that to you next week, if any.

REED F. MORRIS
Direct: (303) 927-0011



3200 Cherry Creek South Drive, Suite 650
Denver, CO 80209
Main:  (303) 777-1411
rmorris@mlmw-law.com
www.mlmw-law.com

This email may contain privileged and confidential information.  If you are not the intended recipient, you are instructed to delete it and notify us immediately.

**From:** Doug Scherling [mailto:jdscherling@gmail.com]
**Sent:** Tuesday, January 13, 2015 5:56 PM
**To:** Reed Morris; Craig Watrous
**Cc:** 'Edward T. DeLisle'
**Subject:** Hudspeth v MC matter

Reed,
Please see attached.
Doug

J. Douglas "Doug" Scherling, Esq.
7086 Bell Drive
Colorado Springs, CO 80920
(719) 229-7739
JDScherling@gmail.com

This message may contain confidential communications and/or privileged information. If you receive this message in error, please delete it and notify the sender.